CECIL C. DAWES v. JOHN W. STARRETT, CLAUDE OLD and THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a Corporation, Appellants.—82 S. W. (2d) 43.

Division One, April 17, 1935.

898

*C. M. Hulen, J. A. Walden* and *Henry I. Eager* for appellants; *Aubrey Hammett* and *Meservey, Michaels, Blackmar, Newkirk & Eager* of counsel.

900

*Harvey & Bellamy* and *Robert D. Johnson* for respondent; *Major J. Lilly* and *Hunter & Chamier* of counsel.

902

904

FERGUSON, C.—This is a malicious prosecution action. Plaintiff herein, Cecil C. Dawes, a former agent at Slater, Missouri, of the defendant, The Prudential Insurance Company of America, was charged, by an indictment returned by the grand jury of Saline County, with the crime of embezzlement of money of said insurance company. The case was tried in the Circuit Court of Saline County, at Marshall, and Dawes was acquitted. He thereupon brought this action, for damages for malicious prosecution, against John W. Starrett, a district superintendent for the Prudential Company, Claude Old, an assistant superintendent and the insurance company. The petition herein alleges, that Starrett and Old "were agents and officers of said defendant insurance company;" that "the defendants by themselves, their agents, servants and employees, acting within the scope of their employment . . . without reasonable and probable cause therefor, voluntarily appeared before the grand jury of Saline County . . . and did then and there maliciously, falsely and fraudulently make complaint of and falsely charge plaintiff with having . . . embezzled and converted to his, plaintiff's use, the sum of $302.49 . . . money and property of said Prudential Insurance Company; . . . that said defendants, their agents, servants and employees, acting as aforesaid fraudulently, maliciously and without probable or reasonable cause, instigated, instituted, presented, pressed and continued said charge against plaintiff before said grand jury and falsely, maliciously, wantonly and without probable or reasonable cause testified before said grand jury that plaintiff did . . . embezzle and convert to his use said sum of $302.49; that upon their false and perjured testimony aforesaid said grand jury found and returned a true bill of indictment against plaintiff . . . charging plaintiff with having . . . embezzled and converted to his own use said sum of $302.49; that upon the trial of said indictment the defendants by themselves, their agents, servants and employees took an active part therein, employed counsel to assist in the prosecution and then and there falsely and maliciously testified that the plaintiff did . . . embezzle and convert to his own use said sum of money; that the defendants at the time of giving said false and perjured testimony against plaintiff, and at all times herein mentioned, knew that plaintiff was not guilty but was innocent of said charge; that plaintiff . . . was acquitted of said charge; that said indictment . . . was instigated and procured without reasonable cause by the fraudulent, false and perjured evidence of the defend-

ants, their agents, servants and employees and in all of said matters said defendants, their agents, servants and employees . . . failed to disclose to said grand jury the true facts known to them bearing upon the question of the guilt or innocence of the plaintiff, of said charge; that if said defendants, their agents, servants and employees, had truthfully and fairly disclosed said facts to said grand jury it would not have returned said indictment against this plaintiff.'' The petition continues with allegations that ''in each and every act done in the prosecution of plaintiff the defendants, their agents, servants and employees acted with malice,'' etc. The defendants' separate answers, in substance the same, state that ''plaintiff was arrested and prosecuted . . . upon an indictment duly and regularly voted and returned'' by the grand jury; ''that the facts, matters and things upon which the indictment was returned and based were first submitted to competent counsel who advised that same constituted sufficient ground and probable cause to believe the plaintiff guilty of a crime and that same should be submitted to the prosecuting attorney;'' thereupon such facts were submitted to the prosecuting attorney who ''upon his own judgment and responsibility submitted same to the said grand jury for its action'' and that there was ''probable and reasonable cause to believe and . . . to suspect that plaintiff had committed a criminal offense.'' The action was filed in the Circuit Court of Pettis County but went on a change of venue to, and was tried in, the Circuit Court of Randolph County. The verdict of the jury was for plaintiff and against all the defendants, assessing compensatory damages in the sum of $30,000 and punitive damages in the sum of $10,000. Defendants filed separate motions for new trial and upon the hearing thereof plaintiff, as a condition prescribed by the court to the overruling of the motions for a new trial, entered a *remittitur* for $20,000 of the compensatory damages and $5000 of the punitive damages, awarded by the verdict of the jury, and thereupon the motions for a new trial were overruled and judgment for plaintiff for compensatory damages in the sum of $10,000 and punitive damages in the sum of $5000, an aggregate of $15,000, was entered. Defendants separately appealed from the judgment.

Plaintiff's petition alleges, and his proof shows, the finding and return of the indictment by the grand jury charging that while an agent of the defendant insurance company he embezzled and converted to his own use the sum of $302.49 of the money of the company. The prevailing rule is that the finding and return of the indictment by the grand jury is prima facie evidence of and establishes probable cause unless the plaintiff in the action for malicious prosecution rebut the presumption by proof that the defendant in the action for malicious prosecution obtained or induced the indictment by false

testimony before the grand jury or by intentionally withholding or concealing from the grand jury pertinent facts necessary to a full and fair investigation which were known to defendant or which he could by due diligence have ascertained, or by other improper or fraudulent means or by showing that defendant though he did not believe the accused to be guilty obtained or procured the indictment against him. [Wilkinson v. McGee, 265 Mo. 574, 178 S. W. 471; Peck v. Chouteau, 91 Mo. 138, 3 S. W. 577; Sharpe v. Johnston, 76 Mo. 660; Steppuhn v. Chicago Great Western Railroad Co., 199 Mo. App. 571, 204 S. W. 579; Firer v. Lowery, 59 Mo. App. 92; Foster v. Chicago, B. & Q. Railroad Co. (Mo.), 14 S. W. (2d) 561; 38 C. J., p. 412; 18 R. C. L., p. 44.] Plaintiff recognizing that the burden is upon him to overcome the prima facie presumption of probable cause arising out of the indictment alleged in his petition, and undertook by proof to show, that defendants themselves and by and through agents and employees obtained and procured the indictment by false and perjured testimony before the grand jury, that they concealed and failed to ›disclose to the grand jury the true facts and that at the time they knew plaintiff was not guilty of the charge made against him but defendants as appellants here contend that the record affords no substantial evidence in support of these allegations of the petition, or either of them, and that therefore the trial court erred in over-ruling defendants' separate demurrers to the evidence. This assignment requires a summary of the facts and circumstances shown by the evidence. It is with misgiving that the writer undertakes such statement. The record is voluminous; approximately one hundred exhibits are in evidence composed of record books, accounts, and reports; the testimony of a large number of witnesses was heard. In view of the mass of evidence in this record and the complex nature of much of it we appreciate the force of the observation which appellants make in concluding their brief herein that ''we realize the difficulty—almost the futility—of trying to explain the complicated facts and contentions of this case to persons who have not specialized more or less, along such lines,'' referring to life insurance business of the kind carried on at Slater by the Prudential Company through plaintiff as its agent, and yet in reading the record, and the briefs herein, we are impressed with the disagreement and differences arising among witnesses, who were supposedly informed and experienced in this phase of the life insurance business, concerning the various records, accounts and reports and the construction and interpretation thereof, methods of bookkeeping and the practices and rules recognized and followed in conducting the business.

The defendant Prudential Insurance Company of America does a general life insurance business. In 1925, plaintiff, a married man, resided with his family at Slater in Saline County where he was em-

ployed in the shops of the Chicago & Alton Railroad. During that year he accepted a position as local agent at Slater for the Prudential quitting his employment at the railroad shops. He continued as agent at Slater for the Prudential until the week of July 2, 1928, when he quit that employment and went to Columbia, Missouri. Slater is in the company's Sedalia, Missouri, district and during the time involved defendant J. W. Starrett was superintendent of that district and in charge of the district office at Sedalia. The district was divided into "Assistancies" each in the charge of any assistant superintendent. Slater is in the "Lexington Assistancy," comprising Lafayette, Ray and Saline counties, under the immediate supervision of the assistant superintendent in charge of the assistancy office at Lexington, Missouri. Hanford Brunk was assistant superintendent in the Lexington assistancy when plaintiff Dawes took over the Slater agency and continued in that position until some time in the early part of 1927 when he was succeeded by a Mr. Milstead. Defendant Claude Old succeeded Milstead as assistant superintendent of the Lexington assistancy and held that position during the year 1928. When Dawes quit his position as agent at Slater in July, 1928, the district superintendent, defendant Starrett, the assistant superintendent, Old, and other officers or agents of the Prudential Company charged that he had not accounted for and paid over to the company certain moneys or funds which were charged to him as agent and which they alleged he had collected and retained. Dawes took the position that he had paid over to the company all money collected by him as agent. Old and Starrett and other representatives of the company went before the grand jury of Saline County and testified concerning the matter. An indictment resulted and upon a trial thereon in the Circuit Court of Saline County Dawes was acquitted and this action followed. From this skeleton statement of the course of events it would appear that the case might be reduced to rather clear and simple issues of fact but the complex nature of the evidence concerning the manner in which the business was conducted, the method of accounting by local agents and items charged against such agent forbids. Most of the Prudential business at Slater was what is known as "Industrial Insurance," policies for small amounts with premiums payable weekly. Plaintiff, however, also wrote and collected intermediate (monthly) insurance and some ordinary policies on which the premiums were payable quarterly semi-annually or annually. As the writer understands the system, the industrial insurance records, reports and accounts were kept separately and constituted a special class of business. These policies were for small amounts with weekly premiums in various amounts dependent of course on the insurance carried. We note weekly premiums of five, ten, fifteen, twenty-five or fifty cents. The industrial insurance in

force in, and charged against an agent for, a certain town or city was known and denominated as the industrial debit under the name of the town as in this instance the "Slater debit." The agent keeps two records of the collections made on his debit. These records are supposed to at all times correspond. First is the agent's collection book which the agent retains and carries with him on his weekly collections. This book is composed of several hundred printed identic form pages. One page is assigned to each family, the names of all members of the family carrying policies being listed on the same page; opposite the names are lined columns showing age, amount of insurance and amount of weekly premium, of each policyholder, followed by dated columns or spaces for each week of the year. The payment of the weekly premiums is shown by the agent placing an X mark, opposite the policyholder's name, in the weekly column or space for the week for and to which the premium was paid with date of the payment noted. Second, the policyholder holds a receipt book and when a premium payment was made to the agent he would enter it, the date thereof and the date to which the premium was paid, at the proper place, on the policyholder's receipt book and sign same. The agent called on the industrial insurance policyholders the first days of each week to collect the premiums for that week. Each week about Thursday and "not later than Friday" the agent made out a weekly report, in duplicate, of his industrial debit, on a form prescribed therefor, known as form 20, showing the items and total thereof charged against him and the items for which credit was claimed and showing the total amount due from the agent to the company for the week. The original report was forwarded to the home office of the company and a duplicate to the assistant superintendent. At the same time the agent would forward an "abstract" of the weekly report, made out on a form prescribed therefor, to the district superintendent. This "abstract" set out the amount as found and shown by the report to be due from the agent to the company. The agent's remittances of collections whether for industrial or other forms of insurance were made to the district superintendent. As the matters and things shown by reports made upon form 20, mentioned supra, are much stressed and bear upon certain issues involved, we shall presently undertake a more detailed explanation of that form but as preliminary thereto we shall here explain "advances," "arrears," "excess arrears" and "lapses" all of which are factors in the system of bookkeeping and accounting and the charges against and credits allowed the agent. As the terms imply advances are weekly premiums paid to the agent in advance, that is beyond the week the payment is made, while arrears are weekly premiums which are past due and remain unpaid. A policy, however, could not be lapsed for nonpayment of weekly premiums until such premiums

had become four weeks in arrears. When weekly premiums had become four weeks in arrears it was the duty of the local agent, within and during the fourth week, or before the fifth Monday, to make up a lapse schedule on a form prescribed for that purpose and report the policy for "lapsing." In making his weekly report the local agent was entitled to take credit for arrears for four weeks but no more. Arrears in excess of four weeks are referred to as excess arrears and were charged to and continued as a charge against the local agent until the policy was lapsed. Without undertaking a detail explanation we note here that it appears the agent's compensation is derived from two sources, a weekly collection salary, which is of course dependent upon the amount of the weekly debit, and a "special salary." Both the superintendent and assistant superintendent work under an additional or "special salary" arrangement. The lapsing of a policy affects and reduces the "special salary" of each, the local agent, the assistant superintendent and the superintendent. Thus if a policy becomes more than four weeks in arrears but is not reported for "lapsing," as the rules of the company require, and is thereby continued in force with all excess arrears thereon charged in the debit, and against the local agent, and the policyholder pays all back premiums the effect of a lapse upon these special salaries is avoided though the failure to report the policy for "lapsing," when the weekly premiums had become four weeks in arrears, violated the positive rules of the company. We come now to the method of effecting a lapse concerning which there is a distinct disagreement in the evidence. As plaintiff construed the company's rules relating to lapse reports, and as shown by plaintiff's evidence concerning instructions given him by the assistant superintendent and the custom and practice followed at the Slater agency during the entire time he was employed as agent there, he was required to and did turn over all lapse schedules to the assistant superintendent whose duty it then was to visit the delinquent policyholder and "endeavor to prevent the lapse" but failing to do so to write in the lapse report at the space thereon designated "Assistant's Report" the date of his visit to the policyholder and his initials. If, however, the assistant superintendent was unable to "interview" the delinquent policyholder he was required to note the "reason" in the space on the lapse schedule set apart for his report. A "Lapsed Policy Schedule" which the local agent made out and delivered to the assistant superintendent showing all policies, at the time, four weeks in arrears contains the following at the bottom thereof:

"Instructions for Assistant Superintendent.

"In the interest of the policyholders and the conservation of business you are expected, whenever possible, to visit the persons listed on this form and endeavor to prevent the lapse of the business. Use

910

the last two columns for your report. Place your initials and the date visited opposite each case in which you saw the insured or the premium-payer personally. If you are unable to interview them give a brief memo of the reason, writing across both columns.''

Rule III of the ''Manual of Instructions for Superintendent's and Assistant Superintendents'' reads:

''It is of the greatest importance that, for the conservation of Industrial business, every case reported for lapse shall be inspected personally by the Assistant Superintendent, if possible, by visiting the policyholder before the schedule is sent to the Home Office, verifying the date of last payment and the cause of lapse, as recorded on form 23.''

(Form 23 is the regular lapse schedule form made out by the local agent.) The assistant superintendent having made the investigation and filled in and initialed that part of the lapse schedule set apart for his report then forwards the schedule to the home office where it is promptly approved, the policy lapsed and a lapse sheet sent by the home office direct to the local agent who inserts it in the loose leaf book known as the ''Life and Lapse Register,'' marks his collection book accordingly and takes credit for the lapsed policy on his next weekly report. The ''Life and Lapse Register'' thus shows the insurance in force and that which has been lapsed. Of course a lapse is not completed until the agent's lapse schedule reaches the home office and is there approved. It was stated that when a policy is lapsed the agent is usually allowed credit for five weeks of premium arrears, thus allowing a week for the schedule to reach the home office. Plaintiff's contention that it was his instructions and also the custom and practice for the Slater agent to make out the form schedule showing the policies on which premiums were four weeks in arrears and deliver it to the assistant superintendent for his further action thereon and that it was then to be sent to the home office by the assistant superintendent was fully confirmed and supported by witness Hanford Brunk who was the assistant superintendent at the time plaintiff became agent at Slater in 1925 continuing in that position, as we have mentioned supra, until early in 1927. Plaintiff claims that pursuant to the company's rules and his instructions from Assistant Superintendents Brunk, Milstead and Old, under whom he served, he regularly each week made out form 23, the lapse schedule, showing all policies on which premiums were four weeks in arrears, and which therefore should be lapsed, and that he regularly delivered this schedule to Old, never later than Saturday, but that Old would hold the schedules an undue length of time and would fail and refuse to send them in to the home office for lapsing, the implication being that Old held the lapse schedules in the expectation that some or perhaps many of the delinquent policyholders

might be induced to pay the unpaid weekly premiums and thereby save his special salary from the reduction resulting when policies in his assistancy were lapsed, and that as a result large amounts of excess arrears accumulated and were included in the Slater debit and charged against plaintiff. Plaintiff says that this situation became such that about the first of June, 1928, he went to Sedalia and made complaint to Superintendent Starrett that he could not get Old to act on lapse schedules, that as a consequence a large amount of excess arrears had accumulated and were charged in the Slater debit, that he "couldn't work" under such "a condition" and that he "was going to quit" if the lapses were not made; that Starrett told him to go "back and work thirty days" and assured him that he (Starrett) would see that Old put through the lapse schedules but that nothing was thereafter done about lapsing a large number of the policies regularly reported upon the lapse schedules delivered to Old and therefore on July 2, he called Old by telephone, told him he was quitting and asked him to come to Slater and "final me." We shall presently go into the dispute about the final accounting. But having stated plaintiff's, apparently well-grounded, contention concerning the procedure necessary to the lapsing of a policy we continue that phase of the matter with a statement of defendants' contention as to that. Defendants say that the assistant superintendent had nothing whatever to do with the lapsing of policies; that Dawes was required by the applicable rules of the company and the instructions given him to send the lapse schedules direct to the home office, that the schedule was not supposed to, and did not, go first to the assistant superintendent and did not have to be investigated, reported on, initialed and sent in by him; that Dawes did not at any time deliver lapse schedules to Old and that such as were sent by Dawes, as the proper procedure required, direct to the home office were immediately approved, the policies reported therein lapsed and a lapse sheet forwarded direct to Dawes for his Life and Lapse Register. However, no lapse schedules made out by Dawes were produced and the explanation was made that the home office only preserved these lapse schedules for six months after the date they were acted on and that all the Dawes' lapse schedules had long since been destroyed. The defendants' evidence makes the direct assertion that if the Slater debit was charged with a large amount of excess arrears it was due alone and solely to Dawes' failure to send lapse schedules to the home office, the implication being that, contrary to the company's rules, he was carrying policies on his books, unreported, on which the premiums were more than four weeks in arrears with the expectation of eventually collecting the unpaid premiums and thereby avoiding the reduction in his special salary which would result from the lapsing of policies. In response to Dawes' telephonic re-

quest that Old come to Slater and "final" him Old arrived at Slater on the following day, Tuesday, July 3. There is a sharp dispute between plaintiff and defendants as to whether or not the accounting made that week under the supervision of Old was what is known as a "final" which question was so interwoven with the controlling issues of fact involved in this action that it seems necessary that we touch upon the evidence relating thereto. Immediately upon Old's arrival at Slater (on Tuesday July 3) he and plaintiff started together upon an "inspection" and collection of the debit. The next day being July 4 (Wednesday) but little was accomplished in furtherance of the "inspection" but the following day, Thursday (July 5) the work was resumed and completed late in the afternoon. That night Old and plaintiff compiled a report of the debit, on form 20, the details of which we shall presently relate. The report purports to be the joint report of Dawes as agent followed by the certificate of Old as assistant superintendent. It purports to show the state of the debit to and including the week of July 2 from and after which time plaintiff ceased to act as agent for the company. Defendants say this was not "a final." Old testified that plaintiff said that due to the fact Wednesday was the Fourth of July very few of the policyholders would be at home and that the final could better be made the following week, that is the week of July 9, and that plaintiff agreed to meet him at Slater the following Monday (July 9) to make the final. However, as we have noted, supra, Old remained in Slater over July 4, the inspection and collection was resumed and completed on Thursday, July 5, and a report compiled as aforesaid. It will be noted that a final report is made on the same form 20 used in making the weekly report but as a final it must be checked, supervised, verified and certified by the assistant superintendent who joins in and signs the report with the local agent all of which was admittedly done in this instance. The following Monday (July 9) plaintiff, who on Sunday, July 8, had gone to Columbia where he had obtained employment, was not at Slater but Old, a successor to plaintiff not having as yet been appointed, went there, made the regular weekly collections and report as assistant superintendent and at some subsequent time sent an inspection book to the superintendent showing a final of plaintiff's account as made of the date of (the week of) July 9. It is admitted that at the joint inspection and collection by Old and plaintiff for the week of July 2, the plaintiff turned over to Old the agent's collection book and all the company records in his possession and that same were retained by Old and were never thereafter again in plaintiff's possession or custody. Such is one requirement on the final. The rules of the company also require that the agent's collection book be blocked, that is marked with a red line, as of the date of the final. This collection book was offered in evidence

and is one of the original exhibits sent here. Plaintiff says the book shows such blocking to have been made as of the week of July 2, while defendants say it shows that it was blocked as of the week of July 9. The jury saw the book and it was for them to determine that circumstance. The rules require that on a final the assistant superintendent accompany the local agent ''to the residence of all policyholders . . . and notify them that the agent is leaving the company and no further premiums are to be paid to him.'' Plaintiff had evidence of substantial compliance with this rule on the joint inspection and collection made by Old and plaintiff for the week of July 2, and that Old remained in Slater over July 4 and until the morning of July 6, in order to perform this work and complete the final. Admittedly the rules require that on a final the assistant superintendent shall receive, retain and remit to the superintendent all moneys collected for the week of the final. Defendant's evidence is that no money for the week of July 2, was ever remitted to either Superintendent Starrett or the home office of the company. Admittedly some money, amounts will later be discussed, was collected by Old and plaintiff, Old sometimes receipting and signing the policyholders receipt book while the other books were signed and receipted by plaintiff. Plaintiff says that all collections made by him at that time were immediately turned over to Old and that pursuant to the company's rule concerning moneys collected on the final all moneys collected for the week of July 2, were turned over to assistant superintendent Old and received and retained by Old and that no sum whatsoever was retained by him. Old denies this and says all moneys collected for that week were retained by plaintiff to be remitted by him, as required in the case of an ordinary weekly report, to the superintendent. As stated, supra, an inspection book which the assistant superintendent is supposed to make out on a final and file with the superintendent was dated and made up by Old as of the week of July 9, however, the plaintiff points out certain items set out therein which indicate that the book was in fact made up at, and as of, a much later date. As mentioned, supra, the rules require that on a final all moneys collected for the week the final is made be turned over to, received and retained, and remitted to the superintendent, by the assistant superintendent. If the joint inspection and collection and the report thereon jointly compiled by Old and plaintiff was the final, as the jury may well have found and believed, and if plaintiff did turn over to Old, and Old did receive and retain, all moneys collected at that time and for the week of July 2, as plaintiff claims and Old denies, then the money was received by the company through its assistant superintendent acting within the scope of his employment and that was a fact known, or which should have been known, to the Superintendent Starrett and the company or a fact with knowledge of

which all the defendants are properly chargeable. It appears that plaintiff Dawes called on some of the policyholders on Monday and Tuesday prior to Old's arrival on Tuesday at Slater and had made some collections which aggregated according to plaintiff's evidence $43.95. Plaintiff testified this money and all other moneys collected as and for the week of July 2, was turned over to Old. Plaintiff further testified that when he and Old had completed the inspection, about five o'clock in the afternoon of ·Friday, July 6, they went to the home of plaintiff's mother-in-law, a Mrs. Talbott, where plaintiff and his wife resided; that both Mrs. Talbott and plaintiff's wife were present at the Talbott home at the time; that Old was staying at the Saline Hotel; that at the Talbott home they (Old and plaintiff) got together all the company's books and records which were in plaintiff's possession and these were there and then delivered to Old and it was there agreed that plaintiff would come that night to Old's room at the Saline Hotel and that they would then make up the report on form 20; that while they were at the Talbott home Old counted the money, or some of it, that had been collected and which had been turned over to him; that while Old was doing so Mrs. Talbott came into the room and paid Old "two weeks premiums on her insurance;" that when Old completed the count of the money he announced "that there was $117;" that plaintiff told Old he "had better get a draft for the money in the morning" and Old replied, "I am responsible for it;" that Old took the books, records and money and left the Talbott home to return to the hotel about six o'clock in the evening; and that at about seven o'clock plaintiff went to the hotel, met Old there, went with Old to his room and they there made out the report. Both Mrs. Talbott and Mrs. Dawes testified to the time of arrival of plaintiff and Old at, and the departure of Old from, the Talbott home as stated by plaintiff; that Old took the agency books and records; that Mrs. Talbott paid her insurance premiums to Old; that Old had possession of sums of money which purported to be the insurance collections for that week and that he counted the money and announced it amounted to $117; fully corroborating plaintiff's testimony in that connection. On the other hand Old testified that no such incident occurred; that when he and Dawes completed the inspection about four o'clock that Friday afternoon they separated; that he went to the hotel arriving there "a little after four o'clock;" that he had an engagement to meet Frank Montgomery, who was an applicant for the position as agent at Slater to succeed Dawes (and subsequently appointed), there; that Montgomery was waiting at the hotel for him when he arrived "shortly after four o'clock" and that Montgomery remained there at the hotel in conference with him until Dawes arrived about seven o'clock that night whereupon Montgomery left and he and Dawes set about the making up of the report.

Montgomery fully corroborates Old's statements as to his whereabouts from about four o'clock P. M. until seven o'clock P. M. of that day. We come now to the joint report for the week of July 2, compiled that night by plaintiff and Old. An explanation of form 20, in detail, without having the form at hand for reference to numbered line and the printed items called for, is difficult. The record is replete with testimony concerning this form and what it purports to show and the form together with reports made thereon for the week of July 2, and several weeks prior thereto, is in evidence; however, we are not encumbering this opinion by inserting it herein. The agent is charged with the amount of the weekly debit. That is arrived at by taking the total of the weekly premiums of all policies on the Life and Lapse Register for that year to the date of the report and deducting therefrom the total of the premium of all policies which have been lapsed to date. The difference is the weekly debit charged against the local agent for that week and remains a charge against the agent, whether any of it is paid or not, less credit for arrears of not more than four weeks to which we presently refer. On the back or reverse side of the report form are numbered lines, the numbers represent the page of that number in the agent's collection book. On these lines and in proper columns are entered the total of arrears for four weeks or less, if any, of the policyholder or holders listed on that numbered page of the collection book. Arrears of more than four weeks are not listed. In the next column are listed total advance payments, in advance of that date, if any, of the policyholder or holders listed on the corresponding numbered page of the collection book. The arrears column and the advance payment column are each totaled and the totals entered at proper lines on the account side or face of the report form. If the total amount of the arrears exceeds the total of the advance payments the difference is entered on the credit side but if the total of the advance payments exceeds the total of the arrears the difference is entered as a charge on that side of the account. Any approved lapse schedules which have been received by the agent since his last previous report are entered on the credit side. The total of all items on the charge or debit side less the total of the lapse credits and the amount of arrears over advance payments, if any, entered on the credit side is entered on a line and in a space designated "Total Collections." Plaintiff argues, and plausibly it appears, that this designation "Total Collections" is misleading as rarely, if ever that amount could or would be actually collected, that it "in no sense" represents money actually collected but is, by the bookkeeping or accounting system prescribed, merely the net amount charged against the agent to balance the account and while it may be treated and charged by the company as such it is not necessarily cash actually collected. On the other

hand, defendants speak of this item as cash and say that if the agent, who they say alone controls the timely lapsing of policies on which premiums have become more than four weeks in arrears, which contention we have noted supra, has promptly caused all such policies to be lapsed and has properly kept his accounts this item would "represent" cash. As leading to the joint report for the week of July 2, prepared by Old and Dawes and which plaintiff, Dawes, claims was the final and which defendants adopted as the basis of their complaint against plaintiff and of the indictment charging the embezzlement of money, we first outline the weekly report made by Dawes for the week of June 25, the week next preceding the week of July 2. On the charge side of that account appear the following items; balance from last account $97.18, weekly debit $131.28, revival debit $4, Total, $232.46. We find that the total of arrears shown, only those of four weeks or less being included, is $169.55 while the total of advance payments is $81.70; the arrears exceed the advance payments in the amount of $87.85 which is entered on the credit side of the account as is also a lapse credit of $19.60. The aggregate of these two items and one other item of seventy-seven cents, an adjustment credit, $108.22 is deducted from the above total charges, $232.46, leaving $124.24 which is entered in the space designated "Total Collections." The report for the week of July 2, prepared by Old and plaintiff, enters first on the debit or charge side the item of $87.85, shown as a credit on the report for the week of June 25, supra, being the excess of arrears credited for that week over the total of advance payments. The report for week of July 2 (and as plaintiff claims the final) shows charges against plaintiff as follows. The item mentioned, balance from last account $87.85; weekly debit, $131.28 and the excess of the total of the advance payments listed on the reverse side over the total of arrears there listed in the amount of $102.86; the total charges against plaintiff shown on the debit side being $321.99. Only a lapse credit of $19.50 is shown on the credit side which deducted from the $321.99 leaves $302.49 as the net amount charged against plaintiff which is entered in the space designated "Total Collections." Plaintiff concedes some money, the exact amount of which he does not undertake to compute, claiming that his collection book and all other records were delivered to Old on July 6 and thereafter retained by the company, was collected by Old and himself. He says the whole thereof was received by Old and the amount thereof is known to Old and the company. In that connection we have not mentioned that plaintiff claims that as collections were made they were at the very time, before leaving the premises of the policyholder, turned over to Old. Plaintiff claims that the amount $302.49 shown as "Total Collections" included a large amount of excess arrears which necessarily under the system of bookkeeping followed and

the failure and refusal of Old to send in to the home office a large number of lapse schedules which he had timely made out and delivered to Old remained as 'a charge against him; that all money actually collected was turned over to Old and that any amount above that charged against him represented excess arrears and at most, and in any event, under his contract, the rules of the company and the system of bookkeeping used could be but a mere indebtedness on his part to the company. However, in this lies, according to plaintiff, the gist of the controversy. Plaintiff says that as he and Old compiled this report he asserted a claim, and contended, that he should be allowed credit for excess arrears, defined and explained supra, as to a number of policies that had not been lapsed though repeatedly reported by lapse schedules which he had timely made out and delivered to Old but which Old had not sent in to the home office and that Old refused to allow credit for any arrears except only those of four weeks or less. Plaintiff says he told Old at the time he would not pay any of these excess arrears and insisted that he should not be charged with them under the circumstances. Old told him that Starrett "would be around to see" him about the matter. When the report had been finally made up and signed, with no credit allowed for any excess arrears, plaintiff asked permission to list policies against which there were excess arrears. He claims Old assisted him in compiling this list. The list showing the names of the policyholders, amount of weekly premiums, number of weeks in arrears and other data, and written on stationery of the "Hotel Saline," was introduced in evidence. Plaintiff said the policies there listed had excess arrears against them aggregating $266. On this trial there was considerable confusion in the evidence as to the correctness of this list and as to the amount of excess arrears. However, plaintiff's position is that all of the net amount charged against him, $302, entered as total collections, which was not represented by money turned over to and received by Old represented excess arrears and that this was known to both Old and Starrett and that their knowledge of the true facts was attributable to the company. Plaintiff did not see Old again until Old appeared as a witness against him at the trial of the indictment and there was no further conference or negotiations between them. As stated on Sunday July 8, plaintiff went to Columbia, where his father resided, to enter upon employment which he had obtained there. Shortly thereafter Starrett called on him at Columbia. Plaintiff testified that Starrett, not mentioning any amount claimed, asked him what he (plaintiff) "was going to do about the shortage;" that he told Starrett he didn't "owe the company anything" and that he had been charged with premiums that "were not collected;" that the talk related wholly to excess arrears and Starrett asked for a copy of the list of excess arrears which plaintiff and Old

had compiled; that he went to his room and "typed off" a copy of the list; that he then went to the local office of the company to deliver the list to Starrett but found that Starrett had left town and that he then mailed the list to him; that about a month later he met Starrett and Feig, the assistant superintendent at the Columbia office of the company, at the post office in Columbia; that on that occasion Starrett, mentioning no amount claimed, inquired if he (plaintiff) had decided to pay "the shortage" to which plaintiff replied he was "still of the opinion" he "did not owe" the company anything; that about a month later Starrett and Feig again called on him at Columbia and Starrett asked "what I was going to do about the arrears" and "I told him I was not going to do a thing;" that later that same day he encountered Starrett and his father discussing the matter on the street; that he entered into the conversation and asked Starrett why he (Starrett) "didn't bring a civil suit." Plaintiff's father testifying concerning this conversation with Starrett said that Starrett approached him and told him Cecil "owed the company;" that "I asked what it was" and Starrett said: "it is excess arrears;" that about that time plaintiff came up and said "I don't owe a cent;" that he (plaintiff's father) then told Starrett to "bring a suit, we will try it that way" and if "Cecil (plaintiff) owes anything he will pay it." Both plaintiff and his father testified that on this last occasion Starrett read an excerpt from a letter purporting to be from the company concerning the conviction and imprisonment in the penitentiary of a former local agent in Kansas and that Starrett stated that "under the laws of Missouri they could do Cecil the same way." Starrett and Feig give a somewhat different version of these conversations. Plaintiff says that the controversy at all times related to the excess arrears which he claimed were charged to him and for which he refused to assume liability. He says that neither Starrett nor the attorneys who later represented and acted with Starrett and others on behalf of the company ever stated or made any claim to him that he had retained the money actually collected for the week of July 2, and that the first time he ever heard that claim advanced was when Old as a witness for the prosecution at defendant's trial for embezzlement denied that he had received the money. On the other hand Starrett says that plaintiff did not, in the conversations at Columbia, say anything about Old having taken the money collected. However, as stated supra, plaintiff says that these conversations related solely to the controversy about excess arrears and his liability to the company therefor, that is whether or not he was bound to pay such charges to the company though they had not been actually collected. While as we have noted, supra, there may have been, and perhaps was, some errors in the computation of the total of excess arrears made by plaintiff on the basis of the list he

and Old compiled that night at Old's hotel room nevertheless there was apparently a large amount in excess arrears. Plaintiff does not attempt to fix the total amount of money for the week of July 2, taken by Old as assistant superintendent on the final which, as plaintiff claims, was then made. He merely states that Old alone counted the money and announced that it amounted to $117. Plaintiff recalls that the money he collected before Old's arrival, and which he says he immediately turned over to Old, who checked the books and verified the correctness of the amount, totaled $44; that he paid Old $13 premium on insurance which he himself at that time took out and that he also turned over to Old $20 intermediate insurance which had been paid to him since the last report covering such payments. As the writer understands, these intermediate insurance premiums are reported on another form and do not appear on form 20 covering the industrial insurance debit and as we recall no question is made that it was not properly reported. However, the $20 was included in and was a part of the money received by Old. These items aggregate $77. If the total sum of money received by Old was $117 then we take it that deducting the $20 and $13 intermediate premiums ($33) from the $117 leaves $84 actually collected on the industrial insurance debit; that is, however, on the assumption that plaintiff's statement that Old took all the money received for the week of July 2, is true, as on the demurrers to the evidence we must do and further that Old correctly stated the total amount. An investigator for the company, one Ward, appeared. Though he seems to have been active in promoting the prosecution having attended the conferences with the prosecuting attorney presently mentioned and appeared as a witness before the grand jury he did not testify, though present on both occasions, in either the trial of the criminal case or the trial of this action. Subsequent to Starrett's last call on plaintiff at Columbia, and evidently following whatever investigation Ward made, Starrett and Ward consulted the law firm of Montgomery & Rucker at Sedalia. The first interview was with Mr. Lee Montgomery of that firm. They showed him the report for the week of July 2, concededly the last week Dawes was in the service of the company, and stated that if plaintiff had correctly kept his books and records and lapsed all policies on which the premiums were more than four weeks in arrears the $302 appearing opposite total collections meant money actually collected. They attempted to explain the industrial insurance plan and the system of bookkeeping, records and reports and exhibited Dawes' books and records. As a witness Montgomery stated that the advice given was based upon the statements made to him by Ward and Starrett and their explanations and conclusions and not upon his own investigation of the books and records. Upon Montgomery's advice it was decided to submit the matter to the

prosecuting attorney of Saline County and a conference with Mr. Storts, the Saline County prosecutor was arranged. Starrett, Ward, Old and Attorney Montgomery attended the conference and presented and submitted the matter to Storts. Neither Starrett, Old nor Ward told Montgomery or Storts, and presumably and inferentially did not later disclose to the grand jury, that the agent must deliver lapse schedules to the assistant superintendent and that the lapsing of policies on which the premiums were more than four weeks in arrears then depended upon the further action of the assistant superintendent thereon nor that the lapsing of policies in any way affected the salary of the superintendent and assistant superintendent, as well as that of the agent, but on the contrary they told Montgomery and Storts, and inferentially the grand jury, that the agent was solely responsible for the lapsing of policies. They did not tell either Montgomery or Storts, and it is to be inferred they did not disclose to the grand jury, that the report was a final and that upon the "finaling" of an agent all money collected was taken by the assistant superintendent but they evidently treated the report as the agent's ordinary weekly report upon which the agent is responsible for the money collected and makes settlement direct to and with the superintendent. They did say that while the $302 represented money actually collected it "might" include as much as $30 or $40 in excess arrears. Neither Montgomery or Storts, nor presumably the grand jury, were told that Old had actually collected some of the premiums for that week and personally signed the policyholders' receipt books therefor or that all money actually collected had been turned over to and received by Old as assistant superintendent as required upon the "finaling" of an agent. But they were told, and apparently so understood, that the $302 entered at total collections represented money actually collected by Dawes, except that "probably" $30 or $40 "might" be excess arrears, and that Dawes had collected the money and retained it. Storts said the facts as stated were so complicated that he was in doubt that they could be clearly and understandingly presented to a jury. The matter was taken under advisement. Some weeks later Starrett, Ward and Attorney Martin of the Montgomery-Rucker firm had another conference with Prosecutor Storts. It was decided at that time that Starrett would make an affidavit charging Dawes with embezzlement, that a warrant would be issued thereon and a preliminary hearing had at which Attorney Rucker would assist in the prosecution and that Martin would prepare the affidavit. Martin, Starrett and Ward returned to Sedalia. Shortly thereafter Martin forwarded the affidavit, which Starrett had made, to Storts. Some time passed during which Storts delayed. The Montgomery-Rucker firm made numerous inquiries of and suggestions to Storts concerning the case by telephone and letter. Storts, however, did not

file the Starrett affidavit and no warrant was ever issued thereon. Finally Storts advised the Montgomery-Rucker firm that he deemed it advisable that the whole matter be submitted to the grand jury which was to be convened at the next term of the circuit court and requested that the witnesses appear before the grand jury without subpoena "to save costs." Pursuant to this request of the prosecuting attorney, Old, Starrett and Ward appeared before the grand jury, without subpoena. Upon their testimony the indictment was returned. At the trial of the indictment, resulting as we have mentioned in Dawes' acquittal, Old and Starrett appeared as witnesses for the State. Attorney Rucker of the firm of Montgomery-Rucker, employed by the company, assisted the prosecuting attorney in the trial of the embezzlement case. The evidence sufficiently shows that in all that was done by Old, Ward and Starrett in instigating, forwarding and carrying on the prosecution they were acting as agents of and for and on behalf of the company. We have observed that if the joint inspection, collection and report made by Old and plaintiff for the week of July 2, was a final, that is the "finaling" of the agent, and there is substantial evidence tending to show that, then the rules of the company clearly and concededly require that the assistant superintendent take, receive and be responsible for all the money paid in or collected for the week and Starrett, Ward, and the company must have known, or at least due diligence required that they investigate and ascertain the facts, that the money paid in that week would be turned over to Assistant Superintendent Old as plaintiff says was done. If plaintiff's version is true, and that was for the jury on the contradictory evidence in this case to determine, Starrett and Old, and through them the company, well knew that there was a large amount, perhaps $200 or more, at least they took the books July 5, and could have ascertained the exact amount, charged against plaintiff in excess arrears which plaintiff said had never been paid but Starrett and Old, and apparently Ward also, chose to treat these arrears as if they were cash actually collected by the agent and as "representing cash" and proceeding on the theory that the net amount charged against plaintiff represented that amount in cash collected, except that "probably" a small part thereof "might" be excess arrears, so presented the matter to the prosecuting attorney, and presumably to the grand jury, as to convey the impression and induce the belief that plaintiff had actually collected such amounts but had refused to pay same over to the company and too that the company had not received any money whatsoever for the week of July 2. The evidence was contradictory but if the facts were as the evidence favorable to plaintiff's theory tends to show, and that was for the jury, then there was substantial evidence tending to show that Old, Starrett and Ward did not disclose the true facts to the

grand jury; that they knew, or by due diligence could have ascertained and known, that plaintiff had not embezzled any of the company's money and that their statements and representations concerning the transaction and certain material facts involved, as made to counsel, the prosecuting attorney, and again on the trial of the embezzlement case and the inference properly follows to the grand jury, were contrary to and at variance with the true facts which they knew or should have known or which by reasonable diligence they could have ascertained. We have commented on the evidence in the review we have made and will not prolong this discussion.

We think the plaintiff made a case for the jury as against all the defendants in that there is substantial evidence tending to show, and from which the jury might infer and find, that defendants procured the indictment by false testimony before the grand jury or the intentional concealment from the grand jury of material facts and that defendants knew that Dawes was not guilty of the embezzlement of money of the company. Therefore the trial court did not err in overruling the separate demurrers to the evidence offered by the several defendants.

An indispensable element of an action for malicious prosecution is want of probable cause, that is that the original proceeding was instituted, resorted to or pursued causelessly and where it appears there was probable cause to institute the original proceeding such fact constitutes a complete defense to an action for malicious prosecution. This is not the ordinary malicious prosecution action which follows the discharge of the accused by a magistrate upon a preliminary hearing or the acquittal of the accused charged with a misdemeanor by an information based upon the affidavit of the person instigating the prosecution. Here there was an indictment by the grand jury which, as we have noted, supra, constitutes prima facie evidence of probable cause and becomes conclusive thereof unless the inference or presumption arising therefrom is rebutted and overcome by proof that the defendant in the action for malicious prosecution obtained or procured the indictment by false or fraudulent testimony or the intentional concealment of material facts known to him or which by the exercise of reasonable diligence he could have ascertained, or by other improper means or that he did not believe the accused to be guilty. A petition in a malicious prosecution action that merely alleges that the defendant therein without probable cause maliciously instigated and obtained the indictment of the plaintiff by a grand jury or that the grand jury indicted plaintiff upon evidence which the defendant maliciously and without probable cause furnished and that upon the trial of the indictment plaintiff was acquitted does not state a cause of action and is demurrable. Though the petition alleges want of probable cause that allegation is canceled

by the allegation that the grand jury returned an indictment which is of itself prima facie evidence of probable cause. [Wilkinson v. McGee, 265 Mo. 574, 178 S. W. 471.] In order to state a cause of action and make a prima facie case the plaintiff here must necessarily, as he did, plead and adduce substantial evidence tending to show, that defendants obtained and procured his indictment by the grand jury by false or fraudulent testimony, the intentional concealment of material facts, or other improper means and did not believe him guilty of embezzlement. That is the only theory upon which the plaintiff can maintain this action. He recognized this in his pleading and we have held there was substantial evidence to make a case for a jury on that theory. If defendants procured the indictment by false or fraudulent testimony, the intentional concealment of material facts, or by other improper means, themselves believing that the defendant was not guilty then the inference or presumption of probable cause which the indictment creates is overcome and wiped out and an inference of want of probable cause arises and supplies that essential and indispensable element of the action. But while plaintiff, by pleading and proof, recognized and followed the correct theory he offered, and the court gave, instructions submitting the case to the jury on another theory. These instructions disregarded and ignored the sole ground on which plaintiff could recover, that is that defendants had procured the indictment against him by false testimony, intentional concealment of material facts, or other improper means, themselves believing he was not guilty; and authorized the jury to determine whether there was probable cause for the indictment; in effect the jury was authorized to find against defendants even if the testimony which defendants caused to be presented to the grand jury and which was the basis of the indictment were true, disregard the action of the grand jury in returning the indictment and the inference of probable cause arising therefrom and themselves determine whether or not there was probable cause for the charge made by the indictment. The jury were not directed and confined to the issue of whether or not defendants had testified falsely before or presented false testimony to, the grand jury or intentionally concealed and failed to disclose to the grand jury material facts or themselves believed plaintiff was not guilty of the charge they were making against him.

Plaintiff's main instruction numbered 1, directing a verdict for plaintiff tells the jury that if they find and believe from the evidence "that the defendants or anyone of them, by their servants or agents, wilfully and maliciously and without probable cause did aid, advise, or procure an indictment to be found . . . charging" plaintiff "with having embezzled the sum of $302.49, the money of the defendant Prudential Insurance Company, or did wilfully, malic-

iously and without probable cause, aid, abet, and advise the prosecution of the plaintiff on said charge or did wilfully, maliciously and without cause aid, abet and advise the continuance of said prosecution, after the filing of said indictment'' and that plaintiff was arrested and ''compelled . . . to go to trial on the charge contained in said indictment, then your verdict should be for plaintiff.'' Plaintiff's Instruction 2, follows the same theory and disregarding the correct theory of the action that defendants procured the indictment by presenting false and perjured testimony to the grand jury, concealment of material facts and did not themselves believe defendant guilty again submits the question of whether there was probable cause for the indictment and prosecution. Appellant assigns as error the giving of all and each of plaintiff's instructions numbered 1 to 17 inclusive. The theory of plaintiff's instructions 1 and 2, authorizing and directing a verdict for plaintiff merely upon a finding by the jury that defendants maliciously procured the indictment without probable cause, ignoring the effect of the indictment on that question and the burden that it imposed upon plaintiff to rebut or overcome the inference or presumption of probable cause arising out of the indictment, runs through plaintiff's instructions except his Instruction 16 to which we shall presently refer. On behalf of defendants the trial court, after a modification not pertinent, however, to the phase of the case now under discussion, gave Instruction F, telling the jury that the plaintiff charges that defendants presented false, fraudulent and perjured testimony before the grand jury and that defendants did not believe plaintiff guilty of the crime of embezzlement; that the burden is upon plaintiff to establish such charges by the greater weight of the evidence, etc. And plaintiff's given Instruction 16, tells the jury that if they ''find and believe . . . that the defendants by themselves, their agents and servants appeared before the grand jury . . . and did then and there . . . falsely and without any probable cause make complaint of and falsely charged and testified'' that plaintiff embezzled $302.49 of the money of the company ''and that because'' thereof the grand jury returned the indictment that their ''verdict will be for the plaintiff.'' Thus plaintiff's instructions permit a recovery by plaintiff on two theories one of which due to the indictment submits an erroneous ground of recovery, while the other, covered by Instruction 16, conforms, and is referable, to the pleadings and proof. We cannot determine in this situation of conflict, contradiction and confusion in the instructions which direction or theory the jury followed or which was the basis of the verdict; whether plaintiff's instructions 1, 2, and 3, and the other instructions consistent therewith, permitting recovery merely upon a finding that though defendants did not resort to perjury or false testimony or other improper means to procure plain-

tiff's indictment that nevertheless there was no probable cause for the indictment or the theory that the indictment was procured by false and perjured testimony presented, by the defendants, to the grand jury as embraced in plaintiff's Instruction 16, and defendants' Instruction F. Plaintiff's Instruction 1, seems to have been copied from an instruction approved in Carp v. Queen Insurance Company, 203 Mo. 295, 101 S. W. 78, and plaintiff relies on that case in support of the instruction and his other instructions allowing a recovery on the ground therein submitted. We do not deem that case an authority under the facts here. The prosecution in the Carp case was commenced in 1902, during the period the act at page 139, Laws of 1900, was in force and effect and in the manner thereby authorized. That act provided that any person having knowledge of a crime might make an affidavit charging the commission of such offense and file same "with the clerk of the court having jurisdiction thereof for the use of the prosecuting attorney or deposit it with the prosecuting attorney furnishing also the names of the witnesses for the prosecution" whereupon "it shall be the duty of the prosecuting attorney to file an information, as soon as practicable, upon said affidavit." Neither a preliminary hearing before a magistrate nor an indictment by a grand jury was required. An agent of the defendants in the Carp case commenced the prosecution by making and depositing an affidavit with the prosecuting attorney upon which the information filed by the prosecuting attorney was based; therefore no preliminary hearing was had, at which the accused was held for trial, nor indictment returned by a grand jury, with the resulting presumption or inference of probable cause.

Appellants further complain that plaintiff's Instruction 1, permits a finding "against all the defendants if the jury should believe that the acts in question had been committed by any one or more of them." If the instruction were otherwise good this objection would not be fatal as the trial court by an instruction submitted five forms of verdict to the jury whereby they were advised they could return a verdict either for or against all the defendants, or for or against one or more of the defendants that is that they were authorized to find against one or more of the defendants and in favor of the other or others as they might find and believe the facts to be. Of a similiar complaint we said in Randol v. Kline's Incorporated, 330 Mo. 343, 49 S. W. (2d) 112: "Complaint is made of several instructions given for plaintiff, among them P-1, an instruction of great length covering the whole case, requiring a finding by the jury of all the essential facts shown by the evidence. The objection is that it did not authorize a verdict against one or more of the defendants and in favor of the remainder. The court, however, furnished to the jury four forms of verdict: A form for finding against all the defendants by

all the jury; a form for finding against one or more of the defendants by unanimous verdict; a form for finding against all the defendants by a majority verdict; and a form for finding against one or more of the defendants by a majority verdict. So the jury could hardly understand that they were not at liberty to find against one or more of the defendants and in favor of the other or others.''

■ Plaintiff's Instruction 3, advises the jury that if ''defendants, or any one of them before instituting the prosecution against plaintiff . . . could have by due diligence ascertained facts which would have convinced a reasonably prudent man that plaintiff did not embezzle any money of the defendant insurance company as charged in the indictment, and that plaintiff bore a good reputation in the community in which he lived . . . then it was their duty to use such diligence to ascertain such facts and if you find that defendants, their agents,'' etc., ''failed to use such diligence and ascertain such facts . . . before instituting the prosecution'' the jury might take that ''into consideration in determining whether said prosecution was without probable cause, and was actuated by malice.'' That plaintiff bore a prior good reputation in the community for honesty and as a law abiding citizen was apparently never at any time questioned by defendants. At this trial plaintiff produced more than a score of character witnesses to that effect. He had been employed by the insurance company after an investigation which among other things involved his reputation for honesty and his standing in the community. He had worked as an agent for the company and under Starrett for approximately three years and under Old for sometime. Defendants were thoroughly familiar with the fact that plaintiff bore a good reputation in the community. The Prosecuting Attorney Storts had known and been well acquainted with plaintiff from their boyhood days and they were friends. Yet this instruction after telling the jury generally that it was the duty of defendants to ascertain any facts bearing on plaintiff's guilt of the crime of embezzlement which, by due diligence, they might have learned singles out, unduly emphasizes and imposes a specific duty upon defendants in that regard as to plaintiff's reputation in the community and carries the implication that if they did not make a new and additional investigation and inquiry concerning plaintiff's reputation in the community immediately prior and preliminary to making the charge of embezzlement against him they were derelict. Stubbs v. Mulholland, 168 Mo. 47, 67 S. W. 650 and Irons v. American Express Co., 318 Mo. 318, 300 S. W. 283, cited by plaintiff are not comparable on the facts as we think will readily appear by reference thereto.

■ Plaintiff's Instruction 6, tells the jury ''that the acquittal of the plaintiff by a jury in the circuit court . . . on the charge of having embezzled the money of the Prudential Insurance Com-

pany may be taken into consideration by the jury along with all other facts and circumstances in evidence in determining whether or not the prosecution against plaintiff was without probable cause." This instruction evidently was intended to follow the theory of plaintiff's instructions permitting and authorizing the jury to determine the question of probable cause for the indictment regardless of whether the indictment was obtained by perjury, fraud or other improper means on the part of defendants or whether defendants themselves believed plaintiff was not guilty. It is proper and necessary that plaintiff show the acquittal in order to establish one of the essential elements of his case, namely the termination of the criminal case in his favor, and the fact of the acquittal was admitted and conceded. Under some circumstances the acquittal may properly be considered as evidentiary of want of probable cause. [Randol v. Kline's Incorporated, 322 Mo. 746, 18 S. W. (2d) 500; Hanser v. Bieber, 271 Mo. 326, 197 S. W. 68; State ex rel. Mann v. Trimble, 290 Mo. 661, 232 S. W. 100.] However, in none of these cases was the prosecution based upon an indictment or an information filed after a preliminary hearing at which the accused was bound over to trial with the resulting inference or presumption in such cases of probable cause. But if it be granted that in a case such as we have here the acquittal is a circumstance having some probative or evidentiary value as tending to sustain the charge that the indictment was obtained by false and perjured testimony or fraudulent or other improper means on the part of defendants nevertheless this instruction singles out this particular fact or circumstance and gives it undue prominence and emphasis, savors of a comment on a single detached fact in the evidence and is an indirect method of submitting an argument to the jury concerning the effect and import of the acquittal nor are these objections met by the inclusion of the language "along with all the other facts and circumstances."

 There was evidence tending to show that Starrett, Old and Ward in good faith, made a full, fair and true statement of the facts to competent counsel, the law firm of Montgomery and Rucker, and were advised by that firm that, in their opinion, plaintiff was guilty of embezzlement with a recommendation that the matter be submitted to the prosecuting attorney. Advice of counsel was submitted by defendants' given Instruction E, and plaintiff's Instruction 14. But plaintiff's Instruction 9, tells the jury that if Starrett was authorized and directed by the insurance company to investigate plaintiff's accounts "and to submit same to Attorneys Montgomery and Rucker and to act as such attorneys advised" and that he "did submit the condition and the account of plaintiff with said insurance company to said attorneys and said attorneys advised that there were probable grounds for the prosecution of plaintiff on the charge

of embezzlement . . . then any knowledge or information obtained in said matters by the defendant, Starrett, and by said Montgomery and Rucker became and were the knowledge and information of the defendant insurance company and attributable to it and the acts and conduct of said defendant, Starrett, and said Attorneys Montgomery and Rucker while acting in said matter became and were the acts of the defendant insurance company.'' The instruction is confusing and misleading and conflicts with the instructions submitting the defense of advice of counsel. That the counsel consulted was competent is conceded yet this instruction, in effect, tells the jury that though Starrett acting for the insurance company fully, fairly and truthfully submitted the facts to counsel for their opinion thereon that the advice or opinion given is to be treated as the act of the insurance company itself and instead of being a protection to the company it is made responsible therefor. The instruction, in effect, deprives the defendant insurance company of the defense of advice of counsel and the right to rely thereon. Plaintiff here says that the instruction refers to the knowledge or information acquired by and the acts of the attorneys ''after their employment'' evidently meaning that the instruction was intended to apply to such knowledge acquired by and acts of the attorneys in the presentation of the matter to the grand jury and the subsequent prosecution of the criminal case but no such distinction is made in the instruction and it specifically refers to the submission of the facts to counsel in the first instance for opinion and advice of counsel thereon. However, in this kind of a case it would seem that advice of counsel would not be a defense for as we have before stated, and reiterated, the controlling issue is whether defendants procured the indictment, and maintained the prosecution, of plaintiff through or by false testimony or fraudulent or other improper means; if so advice of counsel would be of no avail; if not then the presumption or inference of probable cause arising out of the indictment becomes conclusive.

Plaintiff's Instruction 15 advises the jury ''that the mere conversion of money, by an agent or collector of such money, to his own use, after receiving the same in such capacity and by virtue of his agency . . . and the failure to pay it over to his employer, standing alone do not constitute the offense of embezzlement charged in the indictment but there must have been in the mind of such agent and collector, at the time of such conversion, an unlawful, felonious and fraudulent intent to appropriate to such agent's and collector's use and deprive the owner of such use thereof absolutely. And in this connection you are further instructed that if the Prudential Insurance Company owed the plaintiff any money on any account, under the terms of the contract introduced in evidence then the plaintiff would not be guilty of a crime in retaining a sufficient

amount of any money he may have collected for said company not to exceed the sum of $308.49 in order to reimburse himself to the extent of such indebtedness and such retention of such money under such circumstances, by the defendant, would not constitute the crime of embezzlement or any other crime.'' Appellants devote ten pages of their brief to a criticism of this instruction with numerous citations of cases and excerpts therefrom. They criticize the definition of embezzlement first set out therein but we shall pass that and assume, without ruling, that what is stated as to the crime of embezzlement is correct nevertheless plaintiff was not entitled to the instruction. Plaintiff did not claim that the insurance company was indebted to him in any amount, nor does the evidence so show, or that he had retained any money of the insurance company which he, as the company's agent, had collected to ''reimburse himself'' ''to the extent'' of the company's indebtedness to him. On the contrary plaintiff claimed that all sums of money actually collected by him had been paid over to and received by the company and that he turned over all the money collected on the ''final'' to Assistant Superintendent Old as the rules of the company required and that the charges against him in excess of money actually collected and turned over to the company's duly authorized agents were made up of excess arrears on which he had not made any collections and which he refused to pay or acknowledge liability for on the ground that the Assistant Superintendent Old and not he was responsible therefor. There was no substantial evidence to support the instruction yet due to certain vague bits of testimony here and there and the nature of the evidence in connection with the system of accounting and charges and credits the jury might have been led into the realms of speculation and conjecture and have considered that under this instruction they were authorized to find, and justified in the conclusion, that the company might in some way be indebted to plaintiff and that if plaintiff did retain any money he had a right to do so to reimburse himself or to secure himself against the charges entered against him by the company, on the final account, for which plaintiff claims he was not responsible.

Appellants have assailed plaintiff's instructions, one by one, from so many angles and with such close particularity that were we to consider and discuss all the numerous criticisms in detail we would be required to still further unduly prolong this opinion. We therefore note but briefly some of the complaints as to other of plaintiff's instructions. Certain criticisms of instructions 4, 7 and 8, while well made hardly require extended discussion and may be met by slight amendments. Instruction 8 does confuse the terms arrears and excess arrears. The reading of Instruction 12 in connection with and in the light of the other instructions obviates the first and the other criticism of that instruction can be met by an

amendment. The use of the term "shield" in Instruction 14, on advice of counsel, telling the jury that, "None of the defendants can shield himself or itself under advice of counsel unless" etc., has been criticized by the St. Louis Court of Appeals. [Webb v. Byrd, 203 Mo. App. 589, 603, 219 S. W. 683, 686.] The apt criticism of the term can easily be met by revision of the language.

Appellants point out numerous instances in which they claim error in the admission and exclusion of evidence. As the cause is to be remanded for another trial we shall not attempt a full review and discussion of these alleged errors. On another trial the course of the evidence may well be so directed as to avoid substantial or material error in the admission and exclusion of evidence. However, we deem it advisable to briefly note certain instances in this respect of which appellants complain. On the cross-examination of Mr. Lindner, one of the officers of the defendant Prudential Company, plaintiff was permitted over an objection, on behalf of all the defendants, to show by the witness that the Prudential Company owned investments, in the form of loans, in the amount of one billion and sixty-four million dollars. The general rule is that where exemplary or punitive damages are recoverable, as in this case, it is proper for the jury to consider defendant's wealth and pecuniary ability in fixing the amount of such damages. But where the action is against two or more defendants jointly our courts have approved and followed the rule announced by the Supreme Court of the United States in Washington Gas Light Co. v. Lansden, 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543. It is there said: "As the verdict must be for one sum against all defendants who are guilty it seems to be plain that, when the plaintiff voluntarily joins several parties as defendants, he must be held to thereby waive any right to recover punitive damages against all, founded upon evidence of the ability of one of the several defendants to pay them. This rule does not prevent the recovery of punitive damages in all cases where several defendants are joined. . . . But we have no doubt it prevents evidence regarding the wealth of one of the defendants as a foundation for computing or determining the amount of such damages against all." [Schafer v. Ostmann, 148 Mo. App. 644, 129 S. W. 63; Stansberry v. McDowell (Springfield Court of Appeals), 186 S. W. 757 (see separate concurring opinion of STURGIS, J., p. 761); Leavell v. Leavell, 114 Mo. App. 24, 89 S. W. 55; and Wolfsberger v. Miller, 327 Mo. 1150, 1166, 39 S. W. (2d) 758, 765.] But plaintiff contends this evidence might properly be considered as bearing on, or as an aid to the measurement of, compensatory damages; that being competent for that purpose it was admissible and that appellants could have so limited it by proper instructions had they seen fit to do so. The "better doctrine" says Sutherland on Damages (p. 1315), where the action for damages rests upon injury to character or reputation,

standing in society or humiliation and disgrace caused by the wrongful act of defendant is that "compensatory damages may be increased by proof of the wealth of the defendant. This upon the ground that wealth is an element which goes to make up his rank and influence in society and thereby renders the injury or insult resulting from his wrongful act the greater. But in such cases as this it is rather the reputation for, than the possession of, wealth which is the cause of this increased rank . . . only the general question as to his circumstances can" be gone into "and not the details. Where there is more than one defendant the wealth of any of them may be shown, since each is liable for full compensation." Such was the holding of the Kansas City Court of Appeals, per ELLISON, J., in Leavell v. Leavell, supra, citing Missouri cases. But even in such cases, the rule permitting evidence of a general nature, tending to show a defendant's position, rank or influence in society, and in that connection his "reputation for wealth," as affecting compensatory damages, does not permit an excursion into details and an inventory and valuation, assessment or computation of various types, character and kinds of the property holdings of defendant and the inquiry permitted in this instance transgressed the rule in that respect. ■■■

Appellants offered, but the court refused to admit, certain testimony of witnesses, employees and officers of the company, that they were familiar with and experienced in the system and method of records, accounts and reports involved; that they had made an audit or examination thereof and the results of the examination. Three large record books, of hundreds of pages, and more than a hundred exhibits were put in evidence. The jury could not audit and digest these numerous and involved accounts and records. Under the circumstances, and upon a proper showing as to qualification, the witnesses should, we think, have been permitted to testify as to the result shown by their audit and examination of these voluminous and complicated records. Over the objection of defendants plaintiff was permitted to elicit from the Prosecuting Attorney Storts that shortly or immediately before the commencement of the trial of the criminal case he stated to Attorney Rucker that it was his opinion that on account of the complicated nature of the evidence a conviction could not be obtained and proposed that for that reason a dismissal be entered but that Rucker suggested that since the witnesses were present and the case ready for trial that the trial should proceed expressing the opinion that the evidence was sufficiently clear and convincing. True in the course of his testimony Storts stated that upon the information and the explanation of the state of plaintiff's account with, and his reports to, the company as given to him by the defendants he believed plaintiff guilty yet that would not likely offset the prejudicial effect of the admission of his opinion and suggestion as to the advisability of a dismissal with the implications

and inferences that might have been evolved there-out and any way under the issues such evidence was incompetent for any purpose. We will not discuss other of the assignments of error going to the evidence. Such assignments of error as may be well made here will likely not occur on another trial.

Because of the errors noted the judgment is reversed and the cause remanded. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.