JOSEPH H. HAMM, RESPONDENT, v. METROPOLITAN LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—166 S. W. (2d) 324.

St. Louis Court of Appeals. Opinion filed December 8, 1942.

Respondent's Motion for a Rehearing Overruled December 22, 1942.

*William R. Edgar* and *Fordyce, White, Mayne, Williams & Hart-man* for appellant.

*Harry Cole Bates* of counsel.

14

*Tyree C. Derrick, Karl E. Holderle, Jr.,* and *Robert A. McIlrath* for respondent.

McCULLEN, J.—This suit was brought by Joseph H. Hamm as plaintiff against Metropolitan Life Insurance Company, defendant, to recover disability benefits provided for in a group policy of insurance issued by the defendant insurance company to the St. Joseph Lead Company covering plaintiff as an employee of the lead company.

A trial before the court and a jury on March 10th and 11, 1941, resulted in a verdict and judgment in favor of plaintiff in the sum of $1848 plus interest of $485.06, making a total of $2333.06. After an unavailing motion for a new trial, defendant duly appealed.

The petition alleged that plaintiff, on March 24, 1926, was an employee of the St. Joseph Lead Company and continued to work as such employee until March 20, 1928; that on October 1, 1919, defendant issued to the St. Joseph Lead Company a group policy of insurance numbered 368G for the protection of the employees of said lead company; that on September 24, 1926, while plaintiff was an employee of the lead company, defendant issued its certificate insuring plaintiff against death and against total and permanent disability occurring prior to his sixtieth birthday while in the employ of said company; that said insurance provided for the payment of total and permanent disability benefits as a result of bodily injury or disease which prevents the employee from engaging in any occupation and performing any work for compensation or profit, said payments to commence six months after receipt of due proof at the home office of the insurance company. Plaintiff alleged that he would be entitled, under the terms of the policy, to fifty install-

ments of $42.60 each, totaling $2103, that said policy was in the possession of defendant or the lead company and therefore could not be filed by plaintiff as an exhibit; that on March 20, 1928, when plaintiff's employment with said lead company terminated and for a long time prior thereto and since that time and now, plaintiff was and is afflicted with chronic myocarditis and lead poisoning sick spells; that on March 20, 1928, and at all times since, plaintiff was and is totally and permanently disabled and continuously and wholly prevented from performing any work for compensation or profit; that such ailments and conditions arose while he was in the employ of said company and before he attained the age of sixty years. Plaintiff further alleged that he had complied with all the terms and conditions of the policy; that on September 11, 1934, he submitted proof of his disability to defendant, but that on December 27, 1934, defendant denied liability and refused to pay plaintiff the installments provided for in the policy.

The answer of defendant contained a general denial of the allegations of plaintiff's petition, following which defendant alleged that plaintiff's employment with the St. Joseph Lead Company terminated on March 20, 1928, and that the insurance on plaintiff's life under the policy mentioned then and there immediately terminated; that plaintiff was not totally and permanently disabled within the meaning of the policy on March 20, 1928, when his employment terminated and when the insurance was in force. Defendant further alleged that plaintiff failed to submit to defendant due proof that he was totally and permanently disabled while employed by the St. Joseph Lead Company and while insured under said policy; that plaintiff failed to present his claim in any form within a reasonable time after his employment with the lead company and his insurance terminated, and is therefore guilty of laches and unreasonable delay.

Defendant's first contention is that the trial court erred in refusing to direct a verdict in its favor at the close of the entire case. It is argued that the evidence was insufficient upon which to base a verdict for plaintiff because there was no showing that plaintiff was totally and permanently disabled while employed by the St. Joseph Lead Company and while the policy of insurance was in force and effect as to him. A proper consideration of this point requires a review of the evidence.

Plaintiff called as his first witness F. M. Klepsattel, who testified that he was employed by the St. Joseph Lead Company and was in charge of that company's personnel records: that he had been employed by the company for twenty-three and a half years. At this point in the testimony the parties stipulated that the amount of insurance on plaintiff at the time he left the employment of the St. Joseph Lead Company was $1750. The witness testified that plaintiff left the employment of the St. Joseph Lead Company on March 20,

1928, on his own account, stating that the work was too heavy for him; that, according to the records of the company, plaintiff suffered an accident on January 24, 1927, to his left foot and lost about two months time as a result thereof, returning to work on March 24, 1927, after which he worked five weeks as a gateman, and thereafter as a laborer for about seven weeks; that in the week of June 11, 1927, plaintiff returned to the mines as a shoveler and continued there until February, 1928; that plaintiff quit his job in the mines to take a better job in the mill, where he worked for some three weeks up until March 20, 1928.

On cross-examination, the witness testified that the lead company's records showed that while plaintiff worked in the mill he was wheeling lead; that plaintiff received $3.85 per day while working as a gateman and laborer, but that when he returned to the mine in June, 1927, his rate of pay was $5 per day; that he also earned bonuses in addition thereto, the bonuses being earned for work performed in addition to what was considered an average shift's work of eight hours; that after plaintiff returned to the mines on June 11, 1927, there was not a week during the time he was in the mines from that time until the time he was transferred from the mill that plaintiff did not earn a bonus except one week when he did not work—that was the week of February 18, 1928, when he was given leave of absence because there was no place to work and was out four days because of a death in plaintiff's family. The witness then read from the lead company's records items showing the weekly payments of plaintiff's earnings, with the dates and amounts thereof, including bonuses during the period March 22, 1927, to and including March 24, 1928.

The witness further testified that group policy 368G, the policy upon which plaintiff's suit herein is based, was not in force after March 31, 1932.

Plaintiff, in his own behalf, testified that he was fifty years old at the time of the trial; that he was married and had gone only to the fifth grade in school and was not able to read; that he was employed by the St. Joseph Lead Company a number of years as a miner; that the principal part of his work was shoveling ore into cars; that this was the work he was doing when his disability commenced; that he was shoveling ore in one of the St. Joseph mines in the latter part of 1925 and through 1926 up to the early part of 1927; that during said period of time he was not able to do all the duties of his work but was assisted by his fellow employees; that without their assistance he was unable to do his part of the work; that at various times he not only received help from his fellow loaders but also from the drillman; that for about three weeks before he quit on March 20, 1928, he had wheeled lead in the mill and that he was required to take the hot lead with fumes as it came from the drier and wheel it in a wheelbarrow to a car; that the wheelbarrow filled level

would hold probably seven or eight hundred pounds, but he could only push about three or four hundred pounds because he didn't have the strength in his wrists and couldn't hold out to do the work; that he told the mill captain he couldn't do that work because it hurt his chest; that he had pains and when he stooped he became dizzy and would go blind; that he went back in the yard from that job; that his foot was injured about January, 1927, and he went on crutches about three weeks in the mines; that after that he ran an electric pump or did anything to get his time in; that his foot was X-rayed and he found it was broken and he had to stay home from work about two months, during which time he drew Workmen's Compensation; that when he returned to work he was given a job as a gateman for about three weeks then went to the yard for about three months doing different jobs of light work, but that in picking up scrap and stooping down or bending over, his chest would hurt and he would have weak and dizzy spells and would go blind and could hardly raise up; that he went to work then in the mill, which was the last job he had before he quit.

Plaintiff further testified that he worked in the mines during 1926 but never went back underground into the mines after his foot was injured in January, 1927; that before his foot was injured, he worked about three months driving a mule in the mines pulling cars from an electric shovel; that he would take the empty car up and throw it into the heading and get out and "scotch" the car and go sit down while the operator loaded the car. When it was loaded he would knock the "scotch" out and ride the car but would get off and would sit down while the operator loaded because he, plaintiff, had weak spells and "at times can't go;" that he would get exhausted by stooping down "spragging" the cars and coupling them, and his chest and stomach would hurt; that he would get dizzy and blind; that he was required to drive the mules about twenty-five or thirty yards; that before he drove the mules he was shoveling where it was smoky and dusty and had to push the cars and bend down to shovel; that his chest would hurt and he was weak and would get to where he couldn't hold up; that he would sit down and his partner would finish the loading; that sometimes he had cold sweats and vomited; that when it was smoky, the spells would come on him quicker; that he had them as a rule something like two or three days a week when he would have to bend down; that some days he was all right; that he worked with a Mr. Brand about three months and with a Mr. Keith about six months; that he had the same troubles, and when he was sick he would sit down and relax and sometimes, when the drillman finished his work, he would give plaintiff a lift and do the shoveling so they could get out their amount of cars; that in 1924 and 1925 he had some teeth pulled because they were hurting and looked bluish around the gums; that he had weak and dizzy spells; that his condition is the

same that it was; that after leaving the St. Joseph Lead Company, he worked for the Frazier & Davis Construction Company of St. Louis but had weak spells and hurting in his chest and in the small of his back when he stopped down; that after he left the Frazier & Davis Company, he went to Barnes Hospital for about a month where he saw Dr. Lawrence; that he then worked for the Witte Hardware Company, and then went back to the lead belt in 1930 and lived in Elvins, Missouri, on a three-acre farm where he tried to tend a little garden but only did the supervising work, his wife and others assisting in doing the garden work.

On cross-examination, plaintiff testified that about a week after he left the lead company in March, 1928, he operated a drill hammer for Frazier & Davis in St. Louis cutting a sewer; that after working there six weeks he got sick and went to Barnes Hospital every day for three weeks; that after he worked for Witte Hardware Company, where he ran a freight elevator for about a month or longer, a younger man got his job; that he then worked for the Victoria Building operating an electric elevator for perhaps a month but lost that job because they wanted a younger man; that before the Witte Hardware Company job he worked about a week for the St. Louis Basket Box Company pulling cotton wood strips soaked in steam from a machine, where he had to walk five or six steps; that he started work with CWA when it began operations and "practically followed" CWA, PWA and WPA; that he thought after work for CWA ended he came to St. Louis and worked for Willi Transfer Co. for about two and a half months on a garbage truck as a helper picking up garbage from hotels and cafeterias; that from 1935, when WPA started, he had been with WPA except while with Willi Transfer Co. and was at the time of the trial a regular employee of WPA receiving $48 per month. While engaged in WPA work, plaintiff carried water, loaded sand boxes for a concrete mixer, and was also a night watchman. At the time of the trial he was working in a quarry as a driller. For about two years in that WPA work he was a curb setter but was laid off for a period of two months because of eighteen months service. When he went back he did stone dressing, cutting rock. He would hold the drill and another workman would hit it. He could not hold the drill because his eyes were not good and his wrist was weak. He testified that if the rock was too big, he would break it with a hammer or another hole would be drilled and he would trim the rock with a light hammer to make it square; that at the time of the trial he was doing the last-named kind of work, the pay for which was forty cents an hour or $48 a month.

Plaintiff testified on re-direct examination that, when his house was built, his brother and brother-in-law helped; that he did only the supervising work; that he was not able to do any of the other work; that he left the basket and box company because it was hot; that there

were hot fumes and steam and it hurt him to breathe; that when he would stoop he would have hurting spells; that his fingers blistered and his back would hurt; that when he was with the Willi Transfer Co., whenever he would stoop to pick up a large garbage can, he would get weak and blind and couldn't raise it and couldn't keep up with his part of the work.

Lannes Lindsey testified, on behalf of plaintiff, that he worked with plaintiff in No. 2 yard for the lead company in the latter part of 1928; that he and plaintiff were sent out to cut logs in August but he wasn't sure whether it was 1927 or 1928; that plaintiff didn't have the wind to pull the saw because "it takes lots of wind;" that plaintiff would sit down and rest a lot. The witness would trim the logs; that he cut the logs for about three weeks and did the work himself rather than say anything about plaintiff; that when they lifted anything, plaintiff would stagger and couldn't come up with his end of it; that plaintiff worked in the yards for about four or five months or longer, but walked slowly around the jobs he was doing and took his time. On cross-examination, the witness testified that he worked for the lead company about nine years and was laid off he thought in 1929. He did not think it was 1926 instead of 1927 that he worked with plaintiff; that if the record of the lead company shows plaintiff was shoveling underground from June, 1927 until January, 1928, there must be something wrong with the record, but witness would not say the record was wrong and that he was right, but he could not say whether it was 1927 or 1928. On re-direct examination, witness testified that plaintiff was put to work at a gate in the yard by the company because of the injury to his foot, but witness didn't remember whether it was 1927 or 1928.

The deposition of P. G. Keith was introduced on behalf of plaintiff, wherein the witness testified that he worked with plaintiff in 1926 and 1927 at No. 3 in River Mines; that they were shoveling there for about six months; that plaintiff took the poor rock and witness loaded the heavy rock; that plaintiff said then he was sick and had a hurting over his heart and back and couldn't do the work and witness did his work for him; that plaintiff wouldn't show up over four shifts a week, sometimes five; that witness saw him go off and sit down quite often, as much as three or four times a week, sometimes once or twice a day. The witness was asked:

"Q. Did you see any difference in Joe's appearance from the time you first worked with him and when you worked with him last? A. Yes.

"Q. Describe the difference. A. When I first knew him he could do as much work as anybody.

"Q. How about when you first worked with him? A. When I first worked with him he was about as bad as he was when he ended up.

"Q. That was that six months period? A. Yes."

The deposition of Dr. John V. Lawrence was introduced on behalf of plaintiff. Said witness testified therein that he was physician in charge of the clinic at Washington University in St. Louis and was in control of records of people examined there; that the records kept of Joseph Hamm had been destroyed during November, 1939. The only thing remaining was a card which travelogues his whole record and consists of a transcript made by the stenographer from the medical record; that the witness held in his hand a typewritten copy of that record. The witness also identified a letter which he had written for plaintiff while the medical record was still in existence; that he had no independent knowledge of the man and his condition and wouldn't like to commit himself as to what condition the man was in or his ability to work. The letter, signed by Dr. Lawrence, was introduced in evidence as plaintiff's Exhibit B. Said exhibit was on the stationery of the Department of Internal Medicine, Washington University School of Medicine, Barnes Hospital, and dated March 4, 1931, and is as follows:

"Concerning Joe Hamm, 3634 West Pine Blvd. Age 38 in 1928 at which time he was examined in Washington University Disp. in the department of Medicine and Neurology (June 7, 1928).

"Medical examination showed evidence of Chronic Myocarditis and symptoms suspected of lead poisoning. Neurological examination indicated further that his symptoms were possibly due to lead poisoning possibly existing over a long period of time.

"Laboratory test of urine and blood showed no evidence of kidney damage or Syphilis.

"Signed.
"John V. Lawrence
"Director of Clinics."

Dr. Arnold Traubitz testified, as a witness on behalf of plaintiff, that he was a graduate of St. Louis University in 1906 and had practiced his profession in Missouri since that time. He testified that lead poisoning is the absorption of lead into the system; that, when the doctor gets hold of it, the patient usually has cramps in the stomach; that the gums are usually dark blue, the patient hasn't very good control of the muscles, especially in the arms; that chronic myocarditis is an inflammation of the muscles of the heart existing for some time; that psychoneurosis is a disease of the nervous system of the head; that he examined plaintiff about a year before the trial (which would be early in 1940) and found an enlarged heart with a valvular disease; that the valves of the heart which conduct the blood from the heart to the lungs were enlarged; that plaintiff had apparently myocarditis or an enlarged heart; that he also found the patient was suffering from nervousness and aortic regurgitation, which means that the muscles contract to force the blood, the valves fail to

close and part of the blood rushes back to the heart; that this sometimes is caused by hard work, sometimes infections cause it. The witness was asked if he knew what caused it in this case, and answered: "I couldn't very well. I didn't get the history." The witness testified that plaintiff's condition was very low at that time; that on heavy labor he would collapse; that his condition was of a progressive nature and had been coming on for several years. The witness was asked a hypothetical question in which he was asked to assume that plaintiff quit work in the mines on March 20, 1928, and to assume that he was examined at Washington University clinic; that the diagnosis there was lead poisoning, psychoneurosis and chronic myocarditis; that such examination was made June 7, 1928, and June 19, 1928, and was then asked what, in his opinion, would be the probable result to a man's health if he continued to do manual labor in that condition. The witness answered: "It would be deleterious to his health."

Ode Rogers testified, on behalf of plaintiff, that he worked with plaintiff as a driller; that plaintiff did shoveling; that when plaintiff would shovel a while, he would lean back against the car, stand there, and sometimes lean over the car with his head on his arms, and sometimes while shoveling would raise up and stagger back; that witness at that time was on contract with the employer for breaking rock by the ton and plaintiff was one of those who shoveled when necessary, but plaintiff didn't load his amount of cars every day. Once plaintiff complained about the dust, said he couldn't work in the dust and asked for water to put on the machine, and thereafter saw the boss; that the boss talked to witness and witness shut down the blasting machine for the day; that the witness helped the shovelers when they would need a car or so to finish before quitting time. On cross-examination witness testified that shovelers got a bonus after they loaded seven cars, but that witness received a bonus according to what he broke and how much powder he used; that he worked in that heading about nine months. Plaintiff was there about three months. Witness could not say whether that was up to March, 1926; that Mr. Keith worked with plaintiff as a shoveler but that Mr. Keith left the company in 1925 claiming he was totally and permanently disabled.

Ted Williams, fire chief of Flat River, Missouri, testified he saw plaintiff sitting down with a pile of brick around him and a little hammer with which he would knock the lime off the brick; that he saw him picking up little pieces of copper wire, and that plaintiff would squat down to pick them up; that sometimes plaintiff was put on the truck when he didn't have anything else to do; that when plaintiff would get hold of a piece where there were two men, one on one end and one on the other and put it on the truck, plaintiff would go sit down somewhere.

Lena Hamm, wife of plaintiff, testified that they were married December 1, 1932; that plaintiff was not working at that time and

they lived on a three-acre farm west of Elvins, Missouri; that her husband couldn't do much work; that he couldn't stoop; that he would fix the ground the best he could, but that she did all the stooping, planting and covering; that he would have to give up because he would be all worn out; that he hurt in his stomach, chest and back; that he would rest fifteen or twenty minutes before he would be able to work a little more; that they moved to St. Louis but that plaintiff didn't work and that he complained of being dizzy and had weak spells and would lay across the bed a while and then get up feeling better; that since 1932 up to the time of the trial, plaintiff's condition had changed and the spells are closer together than when they married; that plaintiff gets pale and sweat comes out on his forehead. On cross-examination, Mrs. Hamm stated that plaintiff had those spells before she married him and she wasn't living with him when he worked on the elevator for the Frazier & Davis Company or the basket and box company, but was with him when he worked for the Willi Transfer Company; that at the time of the trial plaintiff was working for the WPA and has been since it started in 1935.

Gus McMillan testified that he worked with plaintiff in River Mines during 1927; that plaintiff was then in the yard and working at the gate because of his foot injury; that plaintiff at that time couldn't stand up straight and stoop over; that he would grab his stomach and stagger backwards; that he couldn't do heavy work while in the yard; that this was from the middle of 1927 until the latter part of that year.

Grover Edgar testified, on behalf of plaintiff, that he worked with plaintiff on WPA since the November preceding the trial; that they are doing drilling; that plaintiff holds the drill and witness does the striking because plaintiff said he was nervous and couldn't strike the drill very well; that they were doing this work for about four months; that when they drill the rock, plaintiff cuts it in two but gets short-winded and goes and sits down and doubles up, and rests a while. He is short-winded and complains of hurting in his chest and stomach. On cross-examination, witness testified he had known plaintiff several years and worked with him since November, 1940; that they are classified as stone dressers; that stone dressing is done with a hammer that shapes up the stone after they have been drilled; that the work requires one man to hold and one to strike, and they usually change around but that is optional with the men themselves.

Emil Byington testified, on behalf of plaintiff, that he is foreman on WPA; that he has known plaintiff five years; observed plaintiff holding the drill and the other fellow do the striking; that plaintiff said he had a hurting in his chest; that his wind wasn't good enough; that he heard plaintiff complain several times during the five months they worked together; that during the time plaintiff worked under the witness, plaintiff's partner did the striking.

24

Fred W. Fuhrmeister testified, on behalf of plaintiff, that he formerly operated a retail drug store at Desloge, Missouri; that he knew plaintiff, had filled prescriptions and sold plaintiff medicine for a period of about seven years; that he waited on plaintiff fifty to a hundred times; that he gave him medicine on prescriptions of Dr. Gaebe given to plaintiff for pain; that he sold plaintiff drugs, cod liver oil, and various other drugs; that the January preceding the trial plaintiff came to the store saying he wanted cough syrup and tablets; that plaintiff then was weak all over; that plaintiff complained about being sick or needing medicine.

Defendant did not offer the testimony of any witnesses but introduced in evidence its Exhibits 1, 2, 3, 4, 5 and 6, Exhibit No. 1 being claim papers and correspondence between plaintiff's counsel and defendant in presenting the claim under the policy.

In determining whether or not the action of the trial court in overruling defendant's demurrer to the evidence at the close of the case was proper, we must be governed by the fundamental rule that plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn from all the evidence; that the evidence must be considered in the light most favorable to plaintiff; and that a trial court is justified in sustaining such demurrer only when the facts in evidence and the legitimate inferences to be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.]

Applying the above rule in the case at bar and giving plaintiff the benefit of all reasonable inferences to be drawn from the evidence, we believe the conclusion is inescapable that plaintiff failed to show that he was "permanently and totally disabled" as the result of bodily injury or disease "so as to be prevented thereby in engaging in any occupation and performing any work for compensation or profit," as required by the policy to entitle him to the benefits claimed. If the policy involved herein was one providing benefits for temporary disability or partial disability, or even permanent partial disability, plaintiff would be entitled to such benefits because his evidence shows that he was partially disabled. His own evidence, however, as to his various employments and the different kinds of work he did, not only while working for the lead company but also through the many years thereafter up to the time of the trial, shows affirmatively that he was never at any time "totally and permanently" disabled so as to be "prevented thereby in engaging in any occupation and performing any work for compensation or profit."

It is true plaintiff adduced much evidence, including his own testimony, showing that he had periods of weakness and partial disability when he was aided by fellow workmen in doing some parts of his work. His evidence also shows that there were times, during the years

of his various employments after leaving the lead company as well as while he was in the employ of said company, during which he would be required to cease his work and rest; and that there were also times when he would be given lighter work because of his complaints about his physical condition. It must be remembered, however, that the policy involved herein did not insure him against partial disability or against disability that would prevent him from doing any particular kind of work. The policy herein required proof of "permanent and total" disability such as would prevent him from "engaging in *any* occupation and performing *any* work for compensation or profit." Plaintiff's own testimony that he "worked on the gate;" that he ran a freight elevator; that he worked as a helper on a garbage truck; that he worked in a basket and box factory pulling wooden strips from a machine; that he worked as a curb setter; that he worked as a stone dresser, and continued such employments covering various periods of time in the thirteen years between the time he quit the lead company and the time of the trial, conceding that he may not have been able to do such work in a manner that a younger and stronger man might do it, nevertheless shows that he did not suffer from "total and permanent" disability and directly refutes the contention that he was not able to engage in any occupation or perform any work for compensation.

We are fully aware of the liberal rule, which has been applied in many disability cases by this court and other courts in this State, to the effect that to be "permanently and totally disabled and thereby prevented in engaging in any occupation and performing any work for compensation," a claimant is not required to prove that he is in a complete state of inertia in order to recover benefits such as are involved herein. We realize and fully appreciate that many men attempt to work when their condition is such that ordinary reason and prudence would dictate that they should desist therefrom because a continuance of efforts to work would gravely endanger health and life. Where there is evidence showing such conditions, our courts, including this court, have never failed to hold that a case is made for the jury to decide. However, in the case at bar there is no testimony whatsoever in the record to show or from which it could reasonably be inferred that plaintiff, when engaging in the various employments shown in the evidence, at any time was doing so at the grave risk of his health or life. The testimony of two doctors was adduced on behalf of plaintiff but nowhere did either doctor give testimony or state an opinion to the effect that plaintiff endangered his health or his life by the work he engaged in. It is true Dr. Traubitz, who only saw plaintiff some twelve years after plaintiff left the lead company, testified, in answer to a hypothetical question, that the probable result, if the man continued to do manual labor, would be deleterious to his health. However, taking that testimony

as true, the fact that such labor would probably be harmful is very far from saying it would gravely endanger his life or destroy his health. It is common knowledge that manual labor by persons whose physical condition is below normal would be harmful, but that does not mean dangerous. If the doctor meant dangerous he no doubt would have said so. He did not say so and we may not go beyond what the doctor actually said. Furthermore, it would be pure speculation and guess on the part of the jury or for us to say that plaintiff's various employments endangered his life, or that plaintiff's physical condition at the time of medical examinations related back to the time he worked for the lead company. Plaintiff's own testimony showing that he had been working for WPA since 1935, and that at the time of the trial he was working as a stone dresser earning $48 a month, together with his testimony as to his other employments, completely disproves his claim that he was totally disabled and thereby prevented from engaging in any occupation for compensation.

Plaintiff simply had the misfortune to be afflicted with various ailments throughout the thirteen year period covered by the evidence herein, but his own testimony shows that he was not only able to do work for compensation and profit but that he actually did do so. Furthermore, there is evidence showing that during the period March 22, 1927, to and including March 24, 1928, the last date being four days after plaintiff quit the lead company, he received weekly payments for work done by him as an employee, except for one week, and that many of such payments contained bonuses for extra work.

The fact that plaintiff permitted more than nine years to pass after he quit the lead company before he brought this suit claiming he was totally and permanently disabled while an employee of that company is at least some indication of his own, view of the character of his disability.

It is unnecessary to review the many cases that have been cited by the parties herein because in cases of this character each case must be determined upon its own facts. Those interested in cases denying benefits under similar policies because total and permanent disability was not shown may see Smith v. Metropolitan Life Ins. Co. (Mo. App.), 108 S. W. (2d) 995; Jones v. Metropolitan Life Ins. Co. (Mo. App.), 130 S. W. (2d) 967; Eden v. Metropolitan Life Ins. Co. (Mo. App.), 138 S. W. (2d) 745; Tripp v. Metropolitan Life Ins. Co. (Mo. App.), 144 S. W. (2d) 160; Glore v. Metropolitan Life Ins. Co. (Mo. App.), 153 S. W. (2d) 770.

It must be remembered that this is not a claim for partial disability benefits under the Workmen's Compensation Law. It is a suit upon a contract of insurance which provides for benefits, not for partial disability, but only for "total and permanent disability." We believe that reasonable minds would agree that the evidence in this case, which we have set forth at length, conclusively shows that plaintiff,

although partially disabled, was not permanently and totally disabled within the meaning of the policy.

In view of the conclusion we have reached, other points made by defendant herein need not be discussed.

It is not a pleasant task to reverse a judgment in a case of this kind where plaintiff undoubtedly is in a condition that would justify partial disability benefits if the contract sued on provided for such benefits. However, the policy does not provide for partial disability benefits and we are not authorized to change the contract made by the parties. It is our plain duty to enforce the contract as we find it.

Being of the opinion that the court erred in overruling defendant's demurrer to the evidence, it becomes our duty to reverse the judgment. It is so ordered. *Hughes, P. J.,* and *Anderson, J.,* concur.

### ON MOTION FOR REHEARING.

McCULLEN, J.—Respondent's (plaintiff's) motion for rehearing complains that in the opinion proper in this case we failed to give full meaning to the word "deleterious" used by Dr. Traubitz in answer to a hypothetical question. The definition of deleterious found in Webster's dictionary is cited wherein it is declared to mean "hurtful or destructive; noxious, pernicious," and that as to pernicious, it means "quality of injuring or killing, destructive, fatal, ruinous, very mischievous."

It will be recalled that Dr. Traubitz only saw plaintiff twelve years after plaintiff left the lead company. A reference to the record shows that the hypothetical question which Dr. Traubitz answered required the doctor to assume the following: That plaintiff quit work in the mines on March 20, 1928; that he was examined by Washington University Clinic where the diagnosis was lead poisoning, psychoneurosis and chronic myocarditis, and that the diagnosis was made on June 7, 1928, and June 19, 1928. The doctor was then asked: "What would you say would be the probable result to a man's health if he continued to do manual labor in a condition of that kind?," to which the doctor answered: "It would be deleterious to his health."

Even if it be assumed that the doctor meant, by using the word deleterious, all the things which counsel for plaintiff say he meant, it is nevertheless plain that the question he was answering did not refer to any condition of plaintiff later than June 19, 1928. The hypothetical question did not take into account all the evidence showing that plaintiff at the time of the trial was working for WPA earning $48 per month and had been so working since 1935, nor did the doctor state that plaintiff was at any time between the year 1928 and the time of the trial in March, 1941, doing his work at grave risk and danger to his health or his life.

We are unable to agree with the view that a man can reasonably be said to be ''totally and permanently disabled so as to be prevented thereby in engaging in any occupation and performing any work for compensation or profit'' when he is only partially disabled and is partially able to do work for compensation and profit in many different employments covering a long period of years such as the evidence in the case at bar shows plaintiff was able to do.

Plaintiff points out in his motion for rehearing that the work record of plaintiff while he was with the lead company, as testified to by witness Klepsattel with respect to the bonus and rate of pay of plaintiff for the period March 22, 1927, to and including March 24, 1928, was admitted over the objections and exceptions of plaintiff on the ground that it was not the best evidence. It is true plaintiff did object to such evidence and saved his exceptions, but we think the court's ruling in admitting the evidence was correct. The evidence showed that Klepsattel was the custodian of the records and he had taken a transcript directly from the record of plaintiff's employment with the company, and so testified. It was the same kind of record that he had testified to with respect to the existence of the insurance and everything else concerning plaintiff's employment, but in lieu of offering the record and requiring him to leave it with the court, the witness was asked to testify what the record actually showed, which he did. The witness was not testifying from memory but was testifying from the record by means of a transcript therefrom which he himself had prepared as a matter of convenience. The court in its discretion permitted that to be done and we think the ruling was within the exception to the general rule which requires the best evidence, which exception is to the effect that the court may in its discretion permit a witness to testify as to the result shown by an audit or examination of voluminous and complicated records. [Dawes v. Starrett, 336 Mo. 897, 931, 82 S. W. (2d) 43, 60; Benz v. Powell, 338 Mo. 1032, 93 S. W. (2d) 877.]

The motion for rehearing is overruled. *Hughes, P. J.,* and *Anderson, J.,* concur.